IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SPENCER BERRY,

    Plaintiff,                    No. 2: 12-cv-0363 LKK KJN P

   vs.

DOROTHY SWINGLE, et al.,

    Defendants.             FINDINGS & RECOMMENDATIONS

_____/

        Plaintiff is state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is plaintiff's May 25, 2012 motion for injunctive relief. For the following reasons, the undersigned recommends that this motion be denied.

Legal Standard for Injunctive Relief

        "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009), quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

////

1

1  A Ninth Circuit panel has found that post-Winter, this circuit's sliding scale
2  approach or "serious questions" test survives "when applied as part of the four-element Winter
3  test." Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-32 (9th Cir. 2011).  "In other
4  words, 'serious questions going to the merits,' and a hardship balance that tips sharply toward the
5  plaintiff can support issuance of an injunction, assuming the other two elements of the Winter
6  test are also met." Id. at 1132.

7  In cases brought by prisoners involving conditions of confinement, any
8  preliminary injunction "must be narrowly drawn, extend no further than necessary to correct the
9  harm the court finds requires preliminary relief, and be the least intrusive means necessary to
10 correct the harm." 18 U.S.C. § 3626(a)(2).

11 Plaintiff's Claims

12 In the pending motion, plaintiff requests that the court prohibit defendants from
13 subjecting him to further tuberculosis testing.  In support of this request, plaintiff alleges that in
14 1994, while housed at the California Youth Authority ("CYA") Reception Center, he tested
15 positive for tuberculosis.  Plaintiff alleges that he was given INH medication to treat the
16 tuberculosis for one year.  Plaintiff alleges that he was advised by CYA medical staff that he
17 would always test positive for tuberculosis.

18 Plaintiff alleges that in 2000, he began serving his first term in the California
19 Department of Corrections and Rehabilitation ("CDCR") at the Deuel Vocational Institution
20 ("DVI").  Plaintiff told DVI staff that he had undergone treatment for tuberculosis while housed
21 in the CYA.  Plaintiff assumed that he was then classified as "Code 32," which meant that he
22 tested positive for tuberculosis but that the disease was not active.  According to plaintiff, being
23 classified as "Code 32" also meant that he was not required to submit to further tuberculosis
24 testing.

25 Plaintiff alleges that in 2009, he began serving his second prison term.  In August
26 2010, he arrived at High Desert State Prison ("HDSP").  Plaintiff alleges that prison officials at

1  HDSP told him that he had to take a tuberculosis test.  Plaintiff told prison officials that he was
2  Code 32 and not obligated to submit to a test.  Plaintiff alleges that defendant Daniels threatened
3  to hold him down and give him the test.  Plaintiff submitted to the test under threat of physical
4  harm.  Plaintiff was later informed that CDCR had never requested the Code 32 paperwork from
5  CYA.  Plaintiff alleges that he is being involuntarily subjected to unnecessary tuberculosis tests
6  in violation of his constitutional rights.

7  Attached to plaintiff's complaint are copies of administrative grievances
8  responding to plaintiff's complaints of involuntary tuberculosis testing.  The second level
9  response states that an attempt was made to obtain plaintiff's CYA records from 11 years ago,
10 but they are unavailable and it would be a lengthy process to get them.

11 In the pending motion, plaintiff alleges that on April 20, 2012, prison officials
12 again threatened to force him to take a tuberculosis test even though he showed them documents
13 demonstrating that he is exempt from testing.  Plaintiff alleges that he was physically held down
14 and the tuberculosis test was administered.  Plaintiff alleges that on April 23, 2012, his test was
15 read as negative for tuberculosis, which contradicts all of his previous tests.

16 <u>Defendants' Opposition</u>

17 On August 3, 2012, defendants filed an opposition to plaintiff's motion.
18 Defendants argue that plaintiff's motion is based upon his false belief that he contracted
19 tuberculosis in 1994, and thus is exempt from CDCR's tuberculosis testing program.  In support
20 of this argument, defendants provided the declaration of defendant D. Swingle, the Chief
21 Medical Officer ("CMO") at HDSP.  (Dkt. No. 31-1.)  Although the declaration does not state
22 that defendant D. Swingle is the HDSP CMO, defendant Swingle is identified by plaintiff in the
23 complaint as the HDSP CMO.

24 In relevant part, CMO Swingle states,

25 1. I am familiar with California Department of Corrections and Rehabilitation
   ("CDCR") policies and procedures regarding testing inmates for tuberculosis.
26

2. CDCR's tuberculosis testing program has two compelling objectives. First, annual and emergency tests are used to locate inmates with active tuberculosis. Second, these tests are also crucial to discover cases of latent tuberculosis.

3. Latent tuberculosis means that the person has tuberculosis-causing bacteria in their body but presents no symptoms of suffering from the disease. Symptoms will not appear until the disease becomes active, and there is no practical way for a person with latent tuberculosis to know they have it without a diagnosis. Roughly ten percent of people afflicted with latent tuberculosis will see the disease move into the active phase. It can take up to decades for latent tuberculosis to become active, which can occur due to a litany of negative effects on a person's health such as aging, diabetes, drug abuse, or human immunodeficiency virus ("HIV"). On average, prisoners are more likely than members of the general population to have abused drugs or alcohol and/or be infected with HIV. Accordingly, prisoners with latent tuberculosis are more likely to develop active tuberculosis than are members of the general population.

4. When tuberculosis becomes active, this means the infection spreads throughout a person's body. Much like with a common cold or the flu, when a person with active tuberculosis sneezes or coughs, mycobacterium tuberculosis are spread throughout the immediate environment through the air. Tuberculosis is an airborne disease and it is possible to contract active tuberculosis very shortly after exposure to mycobacterium tuberculosis. Most early symptoms of the disease generally appear unserious and resemble those of the common cold or flu, thus most patients do not know they have tuberculosis: fever, swollen lymph nodes, weight loss and fatigue. Accordingly, most tuberculosis patients do not immediately seek medical treatment, yet are still contagious in these early stages.

5. Communicable infectious diseases are particularly common and dangerous in prisons. Prisons tend to have high population densities and confined living quarters. Further, prisoners tend to be less healthy than members of the general population. Accordingly, prisoners are more likely to contract active tuberculosis than most people and are much more at risk from the disease than are people who are not incarcerated. Therefore, failing to locate all prisoners and correctional employees infected with tuberculosis is extremely dangerous.

6. CDCR cannot wait until tuberculosis in inmates becomes active to test for and treat the disease. Tuberculosis is contagious when active, and due to the confined nature of prison life, once a prisoner's tuberculosis becomes active, he or she will subject everyone around to prolonged exposure. Those circumstances could cause a large-scale outbreak and a significant public health crisis. Accordingly, CDCR officials must have a system in place that allows them to quickly and effectively locate prisoners with latent tuberculosis.

7. If a prisoner or correctional staff member is diagnosed with active tuberculosis, they are immediately quarantined and treated with a regimen of isonicotinylhydrazine ("INH"), a potent antibiotic. A typical INH regimen lasts approximately six months.

8. The tuberculin skin test ("TST") is the most common tuberculosis diagnostic test and has been in use for over 100 years. A TST is performed by injecting 0.1

4

ml of tuberculin purified protein derivative ("PPD") just below the skin's surface on a patient's forearm.

9. TST's are generally read and analyzed two to three days after administration. A TST test is considered negative or inconclusive if a bump that measures five-plus millimeters or smaller appears at the site of the PPD injection. A bump six millimeters or larger is considered a positive test, meaning the person has been exposed to tuberculosis and has tuberculosis antibodies in their system.

10. During my employment with CDCR, I have observed numerous TST's administered to patients without any suffering an adverse reaction more than mild itching or swelling.

11. Tuberculosis can also be detected and diagnosed with the QuantiFERON Gold ("QFT-G") blood test, which analyzes the level of tuberculosis antibodies in a person's blood. QFT-G is medically considered to be very accurate.

12. Active tuberculosis is diagnosed with a chest X-ray or a sputum sample. Chest X-rays reveal whether a patient is suffering from chest inflitrate. Generally, X-rays are a first line defense in diagnosing active tuberculosis but do not provide a definitive answer, because the infections evidenced by a chest X-ray might be due to other conditions, such as pneumonia. When a chest X-ray indicates that active tuberculosis might be present, a sputum sample, also known as a smear, is generally taken to obtain a conclusive diagnosis.

13. A chest X-ray cannot determine if a patient is infected with latent tuberculosis. X-rays only reflect the amount of inflitrate located in a person's chest organs and cavities. Chest infiltrate is not a symptom of a latent tuberculosis infection.

14. Tuberculosis antibodies stay in a person's immune system for the duration of their lives once they have contracted the disease, except in a few rare circumstances, such as HIV or AIDS infections, and in people who are extremely unhealthy and suffer from chronic illness. Even after an INH regimen, a patient will always carry tuberculosis antibodies. Except for the few aforementioned exceptions, if a patient has tuberculosis they will continue to test positive for the rest of their life. Conversely, a person will test negative if they have never had tuberculosis.

15. California prisoners who have previously been diagnosed with latent tuberculosis do not receive TST's. These prisoners already have tuberculosis antibodies in their immune systems. Therefore, a TST cannot determine if they were recently exposed to mycobacterium tuberculosis and any TST given to a prisoner with latent tuberculosis will always come up positive. These prisoners are designated as "Code 32" to signify that they have previously had a positive TST. Code 32 inmates are administered periodic chest X-rays and monitored for the presentation of symptoms that indicate their tuberculosis has become active.

16. Prisoners without a prior positive TST in their medical history are classified as "Code 22," meaning they have no history of a positive TST. Code 22 inmates are administered a TST once a year and whenever transferred to a new prison.

17. The plaintiff in this action, Spencer Berry, contends that he was administered a TST in 1994, while in the custody of the California Youth Authority ("CYA"), now known as the California Department of Juvenile Justice. The results of this test allegedly indicated that he was exposed to mycobacterium tuberculosis, and he was accordingly put on a six month INH regimen and classified as a Code 32.

18. Berry was transferred to High Desert State Prison ("HDSP") in approximately August 2010 from Deuel Vocational Institution ("DVI"). At HDSP on January 25, 2011, Berry was administered a TST. HDSP could not access Berry's CYA medical records, and there was no evidence of Berry's claims of a positive TST in 1994, a subsequent INH regimen, or that he was properly designated as a Code 32 in Berry's CDCR medical records. Although it is unclear, it appears a prison relied upon Berry's representation that he was Code 32 based upon a test and INH treatment in 1994, and staff subsequently relied upon the other Code 32 documentation.

19. Because medical staff did not know if Berry's CYA records could be obtained, and believed that the process to obtain them would be very lengthy, they believed that allowing Berry to refuse a TST and then interact with other inmates and correctional staff presented an unacceptable health risk to Berry, the prison population, and HDSP staff. Accordingly, Berry was given a TST.

20. I have been advised the results of this TST showed a bump measuring roughly five millimeters, which CDCR classifies as a negative or inconclusive test. An inconclusive test result requires the administration of a follow-up TST, known as a boost test. If the inmate refuses a follow-up TST, then a definitive diagnosis can be made by administering a QFT-G. Berry refused to submit to the boost, so he was administered a QFT-G. On January 27, 2011, the QFT-G results clearly established that Berry did not have tuberculosis.

21. In mid-April of 2011, Berry was administered another QFT-G test. On April 18, 2011, the test results once again confirmed that Berry tested negative for either active or latent tuberculosis.

22. I have reviewed Berry's CDCR medical records and conclusively determined that he does not have tuberculosis. Two blood tests confirm that Berry does not have tuberculosis antibodies in his system, and thus, he does not have any form of tuberculosis.

23. If Berry contracted active or latent tuberculosis at any time, including but not limited to 1994, he would still have the antibodies in his system today. Those tuberculosis antibodies would cause him to test positive.

24. Berry does not have HIV, AIDS, or any other condition that would cause him to falsely test negative for active or latent tuberculosis, or otherwise interfere with a TST or QFT-G. Thus, Berry's negative tuberculosis tests conclusively establish that he has never at any time contracted either active or latent tuberculosis.

25. Accordingly, in my professional opinion, Berry has never been accurately diagnosed with tuberculosis.

26. Berry was properly issued a tuberculosis test at HDSP to confirm whether his medically unsupported Code 32 chronos were accurate.

27. Because Berry continues to test negative for tuberculosis and he [h]as never contracted either active or latent tuberculosis, CDCR must continue to test him for tuberculosis under CDCR's tuberculosis testing policy.

(Dkt. No. 31-1 at 1-7.)

Legal Standard for Evaluating Plaintiff's Claims

Prisoners retain a right to bodily privacy; this right, however, may be limited by practices or regulations reasonably related to legitimate penological interests. Michenfelder v. Sumner, 860 F.2d 328, 333–34 (9th Cir. 1988) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)). The Ninth Circuit in Walker v. Sumner, 917 F.2d 382, 385 (9th Cir. 1990), denied a summary judgment motion against an inmate challenging a prison's mandatory AIDS test under the Eighth and Fourth Amendments. There, the Ninth Circuit held that plaintiff's conclusory justifications for the test fell far short of showing that the blood-testing policy was not reasonably related to a legitimate government interest. Like involuntary AIDS testing, tuberculosis testing may violate a prisoner's constitutional rights under the Fourth or Fourteenth Amendments, absent a showing that the testing is reasonably related to a legitimate penological goal. See Rhinehart v. Gomez, 1995 WL 364339 at *3 (N.D.Cal. June 8, 1995).

Analysis

Plaintiff argues that he should not be subjected to future tuberculosis tests because he tested positive for the disease in the past.

Defendants have presented evidence demonstrating that two blood tests taken following plaintiff's transfer to HDSP indicate that plaintiff does not have tuberculosis. Defendants' evidence demonstrates that plaintiff was not accurately diagnosed with tuberculosis in the past. Defendants' evidence demonstrates that based on these negative tests, plaintiff should be subjected to future tuberculosis tests for the sake of his own health as well as the health of other prisoners and correctional staff.

Based on defendants' evidence, the undersigned finds that plaintiff has not demonstrated that he is likely to succeed on the merits of this action. Based on defendants' evidence, the undersigned also finds that plaintiff has not demonstrated that he will be subjected to irreparable harm if subjected to future tuberculosis tests. Finally, the balance of hardships does not tip towards plaintiff in this matter and an injunction is not in the public's interest. For these reasons, the undersigned recommends that plaintiff's motion for injunctive relief requesting that he not be subjected to future tuberculosis tests be denied.[1]

Accordingly, IT IS HEREBY RECOMMENDED that plaintiff's motion for injunctive relief (Dkt. No. 18) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 29, 2012

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

berr0363.pi

---

[1] Plaintiff does not challenge the CDCR policy regarding tuberculosis testing. In other words, plaintiff does not argue that he should not be subject to tuberculosis testing were he to test negative for tuberculosis. Instead, plaintiff's argument is that because he tested for positive for tuberculosis in the past, he should not be subject to future tuberculosis tests.