IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SPENCER E. BERRY,

        Plaintiff,                    No. 2: 12-cv-0363 KJN P

    vs.

DOROTHY SWINGLE, et al.,

        Defendants.             ORDER

_____/

I. Introduction

       Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983. The parties consented to the jurisdiction of the undersigned.

       Pending before the court is plaintiff's motion for partial summary judgment and defendants' cross-motion for summary judgment. After carefully reviewing the record, the undersigned orders that plaintiff's motion is denied and defendants' motion is granted.

II. Legal Standard for Summary Judgment

       Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

////

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1]

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).) "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

---

[1] Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010. However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

1  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

2  III.  Plaintiff's Claims

3      This action is proceeding on the amended complaint filed June 28, 2012 (dkt. no. 28) as to defendants Roach, Swingle, Martin, Reynolds, Zamora, Davis and Daniels.  Defendant Roach has since changed her last name to Silkey.

    Plaintiff alleges that in 1994, while housed in the California Youth Authority ("CYA"), he tested positive for tuberculosis.  As a result, plaintiff was given INH medication for one year and annual chest x-rays were ordered.  CYA medical staff advised plaintiff that he would test positive for tuberculosis for the rest of his life.

    Plaintiff alleges that when he began his first prison term in 2000, he told medical staff at the Deuel Vocational Institution ("DVI") that he had undergone treatment for tuberculosis while housed in the CYA and that he would test positive for this disease.  Plaintiff alleges that he was then classified as "Code 32," meaning he did not have to take tuberculosis tests.

    Plaintiff alleges that he began serving his second prison term in 2009.  At that time, he was again designated as "Code 32" by staff at DVI.  In August 2010, plaintiff transferred to High Desert State Prison ("HDSP").  Plaintiff alleges that following his transfer to HDSP, he was told that there were no records to support the "Code 32" designation.  Plaintiff alleges that he was then forced to take tuberculosis tests in violation of the Eighth Amendment.  Plaintiff also alleges that defendants committed medical malpractice.

    Plaintiff seeks monetary damages and injunctive relief.

IV.  Undisputed Facts

    *Parties*

    At all relevant times, plaintiff was an inmate in the custody of the California Department of Corrections and Rehabilitation ("CDCR").  (Dkt. No. 28 at ¶ 3.)  At all relevant times, defendant Swingle was the Chief Medical Officer for HDSP.  (Dkt. No. 56-1 at 2.)  At all relevant times, defendant Roach was a public health nurse at HDSP.  (Id. at 10.)  At all relevant

1   times, defendant Martin was a supervising registered nurse at HDSP.  (Id. at 16.)  At all relevant
2   times, defendant Daniels was a registered nurse at HDSP.  (Id. at 20.)  At all relevant times,
3   defendant Reynolds was a licensed vocational nurse at HDSP.  (Dkt. No. 28 at 7.)  At all relevant
4   times, defendant Davis was a registered nurse at HDSP.  (Dkt. No. 56-1 at 24.)

     At all relevant times, defendant Zamora was employed by CDCR as the Chief of Inmate Correspondence and Appeals Branch.  (Dkt. No. 56-2 at 2.)  Defendant Zamora played no role in plaintiff's medical care at HDSP.  (Id. at 3.)

*Background Facts on Tuberculosis*

In 1984, tuberculosis cases hit an all-time low, and the federal and state governments stopped supporting the medical infrastructure that once served to contain the disease.  See Guido Weber, *Unresolved Issues in Controlling the Tuberculosis Epidemic Among the Foreign Born in the United States*, 22 Am. J.L. and Med. 503 (1996).  Thereafter, tuberculosis cases steadily increased for over a decade.  In 1993, Congress allocated over $100 million to the Department of Health and Human Services to develop tuberculosis prevention and treatment programs.  (Id.)

Tuberculosis is a disease caused by mycobacterium tuberculosis bacteria, which is spread from person-to-person through the air.  (Dkt. 56-1 at 3, ¶ 4.)  Tuberculosis can be fatal if not treated properly.  (Id.)

There are two types of tuberculosis related conditions:  latent and active tuberculosis.  (Id. at ¶ 3.)

Latent tuberculosis means a person has tuberculosis causing bacteria in his or her body, but the disease is dormant.  (Id.)  People with latent tuberculosis do not know they have been infected, and they will not have any symptoms until the disease becomes active.  (Id.)

Approximately ten percent of the general population will develop active tuberculosis after being infected when body defenses become weakened.  (Id.)  This situation may occur due to aging, human immunodeficiency virus ("HIV") infection, drug or alcohol

abuse, or diabetes.  (Id.)

On average, prisoners have a higher incidence of drug or alcohol abuse and HIV infection than the general population.  (Id.)  Accordingly, prisoners are more likely to develop active tuberculosis from a latent tuberculosis infection than most people.  (Id.)

Active tuberculosis means the infection is spreading within the person's body.  (Id. at ¶ 4.)  When a person with active tuberculosis coughs or sneezes, mycobacterium tuberculosis are expelled into the air.  (Id.)  It is possible to contract active tuberculosis shortly after being exposed to mycobacterium tuberculosis.  (Id.)

The early symptoms of tuberculosis are so mild that most patients do not know they have the disease, and include fatigue, weight loss, fever and swelling of the lymph nodes.  (Id.)  Accordingly, most people do not seek medical treatment immediately after they become contagious.  (Id.)

*CDCR's Tuberculosis Testing Policy*

Communicable infections are particularly common in prisons and spread quickly because of the small confined spaces, high population density, and duration of exposure to other individuals.  (Id. at ¶ 5.)

Prisoners are more likely to contract active tuberculosis than most people and are much more at risk from the disease than people who are not incarcerated.  (Id.)  Consequently, failing to locate all of the prisoners and correctional staff infected with latent tuberculosis is extremely dangerous.  (Id.)

CDCR cannot wait for persons with latent tuberculosis to contract active tuberculosis to test for or treat the disease.  (Id. at ¶ 6.)  Once a latent tuberculosis infection becomes active, the prisoner will subject everyone around him to prolonged exposure to active tuberculosis bacteria in a confined space.  (Id. at 3-4, ¶ 6.)  These conditions could cause a large-scale tuberculosis outbreak and public health crisis.  (Id. at 4, ¶ 6.)  Therefore, it is necessary for CDCR to have an accurate testing program, which is capable of quickly locating everyone at the

prison infected with latent tuberculosis.  (Id.)

The tuberculin skin test ("TST") is the most common tuberculosis diagnostic test and has been in use for over 100 years.  (Id. at ¶ 8.)

TSTs are generally read and analyzed two to three days after administration.  (Id. at ¶ 9.)

Tuberculosis can also be detected and diagnosed with the QuantiFERON Gold ("QFT-G") blood test, which analyzes the level of tuberculosis antibodies in a person's blood.[2]  (Id. at ¶ 11.)  QFT-G is medically considered to be very accurate.  (Id.)

Active pulmonary tuberculosis is generally diagnosed with a chest x-ray and a sputum sample.  (Id. at ¶ 12.)  Chest x-rays reveal whether a patient has a lung infiltrate.  (Id.)  Generally, chest x-rays are a first step in diagnosing active pulmonary tuberculosis but cannot provide a definitive diagnosis because they can only demonstrate the presence of an infiltrate.  (Id.)  However, such x-rays cannot demonstrate what is causing the infiltrate, which may be present due to a number of factors, including typical community acquired pneumonia.  (Id.)  When a chest x-ray demonstrates that a patient might have active pulmonary tuberculosis, a sputum sample, for smear and culture, is taken to obtain a conclusive diagnosis.  (Id. at 4-5, ¶ 12.)

Antibodies to tuberculosis generally remain present in a person's body for the duration of their lives once they have been exposed to the disease, except in a few rare circumstances.  (Id. at 5, ¶ 14.)  If a person is infected with HIV or has AIDS, or is extremely unhealthy or suffers from chronic illness such as diabetes, his immune system may not be able to mount an antibody response to a repeat exposure to the disease.  (Id.)  Even if a person has completed a regimen of treatment for latent tuberculosis with INH, he will always carry

---

[2] As for this undisputed fact, in his opposition to defendants' motion, plaintiff states that he is "without sufficient knowledge and thus this fact is disputed." (Dkt. No. 63 at 16.) Plaintiff's lack of knowledge regarding the QuantiFERON Gold test is not sufficient to put this fact, stated as an undisputed fact in defendants' summary judgment motion, in dispute.

1  tuberculosis antibodies. (Id.) As a result, except for a few aforementioned exceptions, if a
2  patient has been exposed to tuberculosis, he will continue to test positive for the rest of his life.
3  (Id.) Conversely, a person will test negative only if he has never been exposed to tuberculosis.
4  (Id.)

5          California prisoners who have previously been correctly diagnosed with latent
6  tuberculosis do not receive TSTs. (Id. at ¶ 15.) These prisoners already have tuberculosis
7  antibodies in their bodies. (Id.) Therefore, a TST cannot determine if they were recently or
8  remotely exposed to mycobacterium tuberculosis, and any TST given to a prisoner with latent
9  tuberculosis will always come up positive. (Id.) These prisoners are designated "Code 32" to
10 signify that they have previously had a positive TST. (Id.)

11         Code 32 inmates are administered surveys of any symptoms that they may have
12 and periodic chest x-rays when indicated to monitor for signs that their tuberculosis may have
13 become active. (Id.)

14         Prisoners without a prior positive TST in their medical history are classified as
15 "Code 22," meaning they have no history of a positive TST. (Id. at ¶ 16.)

16         Code 22 inmates are administered a TST once a year.[3] (Id.)

17         *Plaintiff's Tuberculosis Tests at DVI*

18         In 2000, plaintiff began serving his first term in CDCR at DVI. (Dkt. No. 28, ¶
19 13.)

20 ////

---

[3] In their statement of undisputed facts, defendants also state that Code 22 inmates are administered a TST whenever they are transferred to a new institution. In his opposition, plaintiff disputes this fact. (Dkt. No. 63 at 19.) Plaintiff alleges that he was transferred to Kern Valley State Prison on November 1, 2012, and has not yet received the test. (Id.) Plaintiff signed his opposition on January 1, 2013. (Id.) The fact that plaintiff had not yet received the test two months after his transfer is sufficient to call into question whether all Code 22 inmates receive TSTs after being transferred. More specific information is required regarding when the test is supposed to be administered following a transfer in order for the undersigned to determine whether it is undisputed that all Code 22 inmates who are transferred receive a TST.

Plaintiff's medical records do not contain any evidence that he was ever properly designated as Code 32; or that he ever contracted any form of tuberculosis. (Dkt. No. 56-1 at 6, ¶ 18-19.)

An unidentified medical staff member at DVI apparently improperly designated plaintiff as Code 32 based solely on plaintiff's unconfirmed representations that he tested positive for tuberculosis in 1994 while he was incarcerated at CYA.[4] (Id., at ¶ 18.) The medical staff member documented plaintiff as Code 32 on a medical chrono. (Id.) Thereafter, staff continued to classify plaintiff as Code 32 based on the initial unconfirmed Code 32 chrono. (Id.)

Defendants played no role in plaintiff's medical treatment prior to his arrival at HDSP which included, but was not limited to, his chest x-rays or other tuberculosis tests.[5] (Dkt. No. 56-1 at 7, ¶ 32; id. at 14, ¶ 24; id. at 17, ¶ 12; id. at 22, ¶ 15; id. at 26, ¶ 14; dkt. no. 56-2 at ¶ 10-13.)

*Plaintiff's Tuberculosis Tests at HDSP*

In August 2010, plaintiff was transferred to HDSP. (Dkt. No. 56-1 at 6, ¶ 18.)

As the public health nurse at HDSP, defendant Roach is responsible for reviewing the medical files of inmates at HDSP to ensure that the records are up to date. (Id. at 12, ¶ 14.)

---

[4] In their statement of undisputed facts, defendants state that a correctional staff member designated plaintiff as Code 32. In his opposition, plaintiff claims it was a medical staff member, not correctional, who initially made the designation. (Dkt. No. 20 at 47.) In support of this claim, plaintiff refers to exhibits attached to the original complaint, which contain several Code 32 chronos signed by medical staff, including what appears to be the original Code 32 chrono. (See Dkt. No. 1-1 at 44.) For this reason, the undersigned agrees with plaintiff that medical staff originally made this designation.
In their statement of undisputed facts, defendants also state that the initial chrono was a custody chrono. In his opposition, plaintiff claims that the original chrono was a medical chrono, and not a custody chrono. (Dkt. No. 20 at 47.) All of the Code 32 chronos attached to the original complaint are medical chronos, including what appears to be the original Code 32 chrono. (See Dkt. No. 1-1 at 44.) For this reason, the undersigned agrees with plaintiff that the original Code 32 chrono was a medical chrono.

[5] In his opposition, plaintiff disputes defendants' undisputed fact that they played no role in plaintiff's medical treatment prior to his arrival at HDSP. However, the record contains no evidence in support of plaintiff's claim that defendants were involved in his medical care prior to his arrival at HDSP.

During her review of plaintiff's records, defendant Roach observed that plaintiff was classified as Code 32, but there was no medical evidence in his file to support that conclusion.[6] (Id.)

Accordingly, defendant Roach believed that CDCR policies and procedures regarding testing inmates for tuberculosis and the California Penal Code mandated that plaintiff be tested for tuberculosis. (Id. at 13, ¶ 15-17.) Defendant Roach recommended to defendant Swingle that plaintiff take a TST in January 2011. (Id.)

Because common medical records retention practice is to hold records for seven years, medical staff at HDSP had a reasonable expectation that plaintiff's CYA records from 1994, which plaintiff claimed contained information regarding his prior positive TST, could not be obtained in 2010, almost 16 years later. (Id. at 6, ¶ 19.)

In January 2011, defendant Daniels advised plaintiff that the California Penal Code authorizes CDCR staff to conduct involuntary testing if the inmate refused to consent to a tuberculosis test. (Id. at 21, ¶ 9.) Plaintiff voluntarily submitted to the test after receiving this information. (Id.)

On January 25, 2011, defendant Reynolds administered plaintiff's first TST. (Dkt. No. 28 at ¶ 19.)

Plaintiff's TST was read on either January 27, 2011, or January 31, 2011. Based on the results of the test, it was determined that plaintiff should have a follow up test, known as a boost test. (Dkt. No. 56-1 at 6, ¶ 20.)

If the inmate refuses a follow-up TST, then a definitive diagnosis can be made by administering a QFT-G test. (Id.)

Plaintiff refused to take the boost TST, but agreed to take the QFT-G test, which is a blood test. (Id.)

---

[6] In his opposition, plaintiff notes that defendant Roach "happened upon this alleged discrepancy" that several other public health nurses at other prisons had missed. (Dkt. No. 63 at 21.) While this may be true, it does not create a dispute as to whether defendant Roach actually made the observation regarding plaintiff's unsupported Code 32 status.

10

1  On either April 15, 2011, or April 18, 2011, the QFT-G test was performed on plaintiff. (Id. at ¶ 21.) Plaintiff tested negative for tuberculosis. (Id.)

The result of plaintiff's QFT-G test conclusively established that plaintiff had never contracted tuberculosis. (Id. at ¶¶ 21-25.) If plaintiff contracted active tuberculosis or latent tuberculosis at any time, including but not limited to 1994, he would still have the tuberculosis antibodies today, and those would cause him to test positive for tuberculosis. (Id.)

On April 23, 2012, plaintiff received a TST, which was negative for tuberculosis. (Id. at ¶ 24.) Because plaintiff has never contracted either active or latent tuberculosis, CDCR must continue to test him for tuberculosis under CDCR's tuberculosis testing policy. (Id. at ¶¶ 23-25.)

V. Eighth Amendment Claim

In his motion for partial summary judgment, plaintiff argues that defendants forced him to submit to tuberculosis testing without first attempting to obtain his records from CYA. Plaintiff also alleges that defendants' inadequate record keeping caused plaintiff to be subjected to ten years of annual chest x-rays which exposed him to harmful radiation.

Defendants move for summary judgment on grounds that they were not involved in plaintiff's medical care prior to his transfer to HDSP and on grounds that they did not act with deliberate indifference in violation of the Eighth Amendment by ordering plaintiff to take tuberculosis tests.

A. Plaintiff's Care Prior to his Transfer to HDSP in August 2010

Defendants move for summary judgment as to plaintiff's claims challenging his treatment for tuberculosis prior to his transfer to HDSP in August 2010 on grounds that they were not involved in his treatment prior to that time. Plaintiff's amended complaint contains no claim alleging that defendants were responsible for his treatment prior to his transfer to HDSP. Plaintiff may not amend his complaint by way of his summary judgment motion to include this claim.

In any event, as noted above, it is undisputed that defendants were not involved in plaintiff's tuberculosis treatment prior to his transfer to HDSP. Plaintiff has provided no evidence in support of his claim that they were involved.

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Servs., 436 U.S. 658, 692 (1978) ("Congress did not intend § 1983 liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976) (no affirmative link between the incidents of police misconduct and the adoption of any plan or policy demonstrating their authorization or approval of such misconduct). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

The record contains no evidence linking defendants to the medical treatment plaintiff received for tuberculosis prior to his transfer to HDSP.

For the reasons discussed above, defendants are granted summary judgment as to plaintiff's claim that they were involved in his misclassification as Code 32 and receipt of chest x-rays prior to his transfer to HDSP.

B. Plaintiff's Treatment Following his Transfer to HDSP

Plaintiff argues that the tuberculosis tests he received following his transfer to HDSP were unnecessary medical treatment in violation of the Eighth Amendment. Defendants argue that they are entitled to qualified immunity.

*Legal Standard for Qualified Immunity*

Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).

In resolving the claim of qualified immunity, the court must determine whether, taken in the light most favorable to plaintiff, defendants' conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121 (2001); Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009). Courts have discretion to address the two-step inquiry in the order deemed most suitable under the circumstances. Pearson, 555 U.S. at 236 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation).

A right is clearly established if "it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted ... or whether the state of the law [at the time of the violation] gave fair warning to the official[ ] that [his] conduct was [unlawful]." Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (internal quotation marks and citations omitted). This analysis does not require that the same factual situation must have been decided, but that existing precedent would establish the statutory or constitutional question beyond debate. Id.; Nelson v. City of Davis, 685 F.3d 867, 884 (9th Cir. 2012).

*Legal Standard for Eighth Amendment*

Generally, deliberate indifference to a serious medical need presents a cognizable claim for a violation of the Eighth Amendment's prohibition against cruel and unusual

punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976).  According to Farmer v. Brennan, 511 U.S. 825, 847 (1994), "deliberate indifference" to a serious medical need exists "if [the prison official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  The deliberate indifference standard "is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997). Specifically, a determination of "deliberate indifference" involves two elements: (1) the seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to those needs. McGuckin, 974 F.2d at 1059.

First, a "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." Id. (citing Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for medical attention include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. McGuckin, 974 F.2d at 1059–60 (citing Wood v. Housewright, 900 F.2d 1332, 1337–41 (9th Cir. 1990)).

Second, the nature of a defendant's responses must be such that the defendant purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for "deliberate indifference" to be established. McGuckin, 974 F.2d at 1060.  Deliberate indifference may occur when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison physicians provide medical care." Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988).  In order for deliberate

indifference to be established, there must first be a purposeful act or failure to act on the part of the defendant and resulting harm. See McGuckin, 974 F.2d at 1060. "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." Id. Second, there must be a resulting harm from the defendant's activities. Id. The needless suffering of pain may be sufficient to demonstrate further harm. Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

Mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981). However, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id.

In order to defeat defendants' motion for summary judgment, plaintiff must "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809 F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an excessive risk to plaintiff's health," Jackson v. McIntosh, 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

*Analysis – Did Defendants' Conduct Violate Plaintiff's Constitutional Rights?*

Plaintiff argues that defendants violated his Eighth Amendment rights by subjecting him to unnecessary tuberculosis tests. Plaintiff argues that because he tested positive for tuberculosis in the past, defendants were not permitted to subject him to tuberculosis tests. Defendants argue that, based on the undisputed evidence, plaintiff had never contracted any form of tuberculosis, so testing plaintiff for tuberculosis was appropriate.

The undersigned first finds that there is no evidence in the record supporting plaintiff's prior Code 32 classification. Defendants were not unreasonable in questioning this

prior classification as it was unconfirmed by any medical records. While plaintiff argues that defendants should have taken steps to obtain his records from CYA which plaintiff claims would have supported the classification, defendants have presented evidence demonstrating that it would have been difficult if not impossible to obtain these records. The undersigned notes that plaintiff also has not obtained these records. For these reasons, the undersigned does not find that defendants acted with deliberate indifference when they chose not to investigate plaintiff's CYA records and ordered plaintiff to take the tuberculosis tests.

Plaintiff argues that the results of his initial TST at HDSP were positive, supporting his claim that he had been properly classified as Code 32. Plaintiff also suggests that he should not have been required to go on to take the QFT-G test based on this positive test result.

For the reasons discussed below, the undersigned finds that taking the facts in the light most favorable to plaintiff, the results of his initial TST at HDSP was positive. In their statement of undisputed facts, defendants state that on January 27, 2011, plaintiff's TST produced a 1.5 mm raised induration, which is a negative test for tuberculosis. (Dkt. No. 56 at 7, ¶ 47.) Defendants state that on January 31, 2011, a staff member recorded an induration of 5 mm, which classifies as negative or inconclusive. (Id. at ¶ 51.)

Attached to plaintiff's original complaint is an entry from his medical records indicating that plaintiff had a 5+ mm induration on January 25, 2011, and or January 31, 2011. (Dkt. No. 1 at 83.) This record also indicates that the reading of 5+ mm was classified as positive. (Id.)

Taking the facts in the light most favorable to plaintiff, based on the medical records discussed above, the undersigned finds that his initial TST at HDSP was positive. However, defendants did not act with deliberate indifference by ordering the QST-G test in order to obtain a definitive diagnosis based on this result. As indicated by plaintiff's negative QST-G test result, the positive TST did not necessarily mean that plaintiff had tuberculosis. Defendants

16

acted reasonably in ordering the QST-G test in order to verify his diagnosis. Plaintiff's positive TST at HDSP also may explain plaintiff's prior Code 32 classification. In other words, plaintiff may have received a positive TST at CYA, but CYA officials did not go on to perform further testing in order to obtain definitive results, as did the defendants in the instant case.

Plaintiff suggests that defendants acted with deliberate indifference by forcing him to take the TST because it caused him to suffer unpleasant side effects. Defendants states that mild itching or swelling at the site of the skin test is a normal reaction for a TST. (Id. at 21, ¶ 4.) Other than swelling about the size of a pencil eraser or mild itching, TST does not have any adverse reactions. (Id.) In contrast, plaintiff alleges that he experienced pain, itching and swelling at the injection site, as well as nausea. (Dkt. No. 63 at 15.)

Assuming plaintiff's more extreme symptoms were caused by the TST, there is no evidence that these symptoms are common side effects of this test. Defendants administered a test to plaintiff, of which the known side effects were mild. For this reason, plaintiff's alleged suffering of more serious side effects does not mean that defendants acted with deliberate indifference in administering the TST.

Plaintiff also alleges that he was forced to submit to the tuberculosis tests at HDSP under duress. Plaintiff alleges that defendant Daniels told him that if he did not submit to the TST, he would be physically removed from his cell and held down so that the test could be administered. (Dkt. No. 28 at 4.) Plaintiff alleges that he did not physically resist the tests because he did not want to experience physical force. For this reason, the undersigned finds that plaintiff has not stated any claim for excessive force against defendants.

Plaintiff has also not stated a separate claim alleging violation of his right to be free from bodily intrusion. See Washington v. Harper, 494 U.S. 210 (1990) (Supreme Court upheld constitutionality of prison policy permitting state to administer antipsychotic drugs to a prisoner against his will if he had a serious mental illness and posed threat of harm to self and others). Plaintiff does not generally challenge defendants' right to test prisoners for tuberculosis.

Instead, he argues that he should not have been subject to the test based on a past positive test. Plaintiff appears to concede that if he had tested negative in the past, defendants would be justified in administering the TST. In any event, it is unlikely that plaintiff would succeed on a claim alleging violation of his right to be free from voluntary intrusion because defendants have presented evidence that they had a legitimate interest in testing plaintiff for tuberculosis. See Rhinehart v. Gomez, 1995 WL 364339 (N.D.Cal. 1995) (rejecting claim alleging violation of right to be free from bodily intrusion because state had legitimate interest in conducting tuberculosis test that outweighed plaintiff's interests).

The undersigned agrees with defendants that plaintiff's claims rest upon his false belief that he contracted tuberculosis in 1994 and, thus, any tuberculosis tests were medically unnecessary. As demonstrated above, there is no evidence that plaintiff contracted tuberculosis. Because defendants in the instant action determined that plaintiff does not have active tuberculosis, plaintiff will no longer be subject to annual chest x-rays. Accordingly, defendants are granted summary judgment as to plaintiff's Eighth Amendment claim because the record demonstrates that they did not act with deliberate indifference by requiring plaintiff to take tuberculosis tests.

*Analysis: Were Plaintiff's Rights Clearly Established?*

Because defendants did not violate plaintiff's Eighth Amendment rights, the undersigned need not consider the second prong of the qualified immunity analysis, i.e., were plaintiff's rights clearly established.

VI. Remaining Matters

A. State Law Claim

Plaintiff alleges that defendants committed medical malpractice. Defendants move for summary judgment as to the merits of this claim.

"To establish a medical malpractice claim, a plaintiff must allege in the complaint: (1) defendants' legal duty of care toward plaintiff; (2) defendants' breach of that duty;

(3) injury to plaintiff as a result of that breach-proximate or legal cause; and (4) damage to plaintiff." Rightley v. Alexander, 1995 WL 437710 at *3 (N.D.Cal. July 13, 1995), citing Hoyem v. Manhattan Beach School Dist., 22 Cal.3d 508, 514 (Cal.1978); 6 B.E. Witkin, Summary of California Law, Torts § 732 (9th ed.1988).

The standard of care in a medical malpractice case is a matter "peculiarly within the knowledge of experts;" as such, "expert testimony is required to prove or disprove that the defendant performed in accordance with the standard of care unless the negligence is obvious to a lay person." Johnson v. Superior Court, 143 Cal.App.4th 297, 305 (2006); Hutchinson v. United States, 838 F.2d 390, 392-93 (9th Cir. 1988).

For the same reasons the undersigned found that defendants did not violate the Eighth Amendment, the undersigned finds that defendants did not commit medical malpractice by ordering plaintiff to take tuberculosis tests. Because the record demonstrates that plaintiff's Code 32 classification was not supported by his medical records, defendants did not breach a duty of care to plaintiff by requiring him to submit to tuberculosis tests. Moreover, plaintiff has presented no expert testimony disproving that defendants acted in accordance with the standard of care. For these reasons, defendants are granted summary judgment as to plaintiff's medical malpractice claim.

B. Injunctive Relief

Defendants argue that plaintiff's claims for injunctive relief are moot because he is no longer housed at HDSP. On November 26, 2012, plaintiff filed a notice of change of address indicating that he was transferred to Kern Valley State Prison (KVSP). (Dkt. No. 52.) No defendants are located at KVSP.

When an inmate seeks injunctive relief concerning an institution at which he is no longer incarcerated, his claims for such relief become moot. See Sample v. Borg, 870 F.2d 563 (9th Cir. 1989); Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir. 1986). See also Reimers v. Oregon, 863 F.2d 630, 632 (9th Cir. 1988). Plaintiff has demonstrated no reasonable possibility

that he will be incarcerated at HDSP at any predictable time in the future. Accordingly, plaintiff's request for injunctive relief is moot.

### C. Plaintiff's Motion for Appointment of Counsel

On April 15, 2013, plaintiff filed a motion for appointment of counsel. Because the undersigned grants defendants' summary judgment motion, appointment of counsel for plaintiff is not warranted.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for partial summary judgment (dkt. no. 44) is denied;

2. Defendants' cross-motion for summary judgment (dkt. no. 55) is granted; and

3. Plaintiff's motion for appointment of counsel (dkt. no. 68) is denied.

DATED: May 7, 2013

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

ber363.sj